Frank SCHMIDT, Plaintiff, Appellant, and Cross–Appellee,

v.

GRAND FORKS COUNTRY CLUB, a North Dakota Corporation, Defendant, Appellee, and Cross–Appellant.

Civ. No. 890373.

Supreme Court of North Dakota.

Aug. 9, 1990.

Ralph F. Carter (argued), Mack, Moosbrugger, Ohlsen, Dvorak & Carter, Grand Forks, for plaintiff, appellant, and cross-appellee.

Douglas A. Christensen (argued), Pearson, Christensen & Fischer, Grand Forks, for defendant, appellee, and cross-appellant.

VANDE WALLE, Justice.

Frank Schmidt appealed from a district court judgment rescinding a 1963 contract between Schmidt and the Grand Forks Country Club [Club] and awarding him $2,000 plus interest. The Club cross appealed from the judgment. We affirm in part and reverse in part.

In 1962, the Club decided to purchase land in Grand Forks County for the purpose of constructing a new facility and golf course. To help raise funds for the project, the Club determined that some of the property would be platted as a residential subdivision and individual lots would be sold to Club members. On September 26, 1963, the Club sent a notice to members of the terms and conditions of an auction sale for the properties. The notice stated that a "marketable title of record" would be issued to each purchaser, subject only to restrictions as to use, building, resale, and public utility easements "as shall be imposed upon each lot by the Board of Directors of the ... Club after a public meeting with all lot owners, on or before six months from October 15, 1963." At the auction, Schmidt purchased one lot for $2,000.

A preliminary plat was prepared and reviewed at an initial meeting of the lot owners on April 1, 1964, and a second meeting of lot owners was scheduled. The plat was to be finalized and forwarded to the Grand Forks Planning and Zoning Commission for approval and recording. However, there was no second meeting, the plat was not presented to the Commission for approval, and the plat was not recorded.

Schmidt moved to Denver, Colorado in 1965. Realizing he had not received a warranty deed for the lot from the Club, Schmidt contacted his Grand Forks attorney and told him that he wanted to rescind his lot purchase and seek a return of his $2,000. The attorney informed the Club of Schmidt's decision to rescind for failure to receive the deed. A Club official advised the attorney that Schmidt's deed had been placed in escrow at a local bank. Schmidt demanded delivery of the deed from the bank and, pursuant to advice given by the Club official, Schmidt had the deed recorded in July 1967. Warranty deeds had also been issued to the other lot purchasers but none of these deeds were recorded.

Between 1966 and 1985, both the city of Grand Forks and Grand Forks County exercised land-use jurisdiction over portions of the Club property, and each entity enacted various ordinances relating to zoning and subdivisions. During this period of time, minimum lot sizes for residential subdivisions in the area ranged from 2.5 acres to 5 acres. After 1966, the size of Schmidt's lot failed to meet any of the minimum lot-size requirements. The trial

court found that the Club "took no action to file a plat with either the city of Grand Forks or the county of Grand Forks Planning and Zoning Commission, nor did the [Club] ever request a variance from subdivision and zoning regulations, nor did the [Club] attempt to establish a new classification for 'country club' developments."

Schmidt moved back to Grand Forks in 1970. By 1972 Schmidt had discovered that the original proposed plat had not been recorded and that until the plat was recorded, he could not obtain a building permit for his lot. He was also aware that his lot did not meet the minimum lot-size requirement. During the ensuing years, Schmidt spoke with Club officials and other Club members on several occasions regarding residential development of the property. Although Club officials apparently considered Schmidt's proposals and said they would "cooperate" in resolving the lot problems, the Club took no action to further residential development of the property.

During 1979 and 1980, Schmidt purchased, for $2,500 each, seven additional lots from individuals who had originally purchased the lots in 1963. According to the trial court, Schmidt purchased the additional lots "in order to place himself in a better position, profit wise, in the event that the property was developed and an approved subdivision plat was obtained." The lot conveyances were accomplished by delivery of quitclaim deeds from the sellers.

In 1980, Schmidt was aware that the Club did not have the money available to pursue residential development of the lots. Nevertheless, Schmidt made a proposal to the Club that the lot lines for the original lots be extended upon the golf course to meet the minimum lot-size requirement with a portion of the lot designated to be built upon and the rest subject to a golf course easement. Schmidt's proposal to extend the lot lines was rejected by the Club.

After informing the Club that he had purchased the additional lots, Schmidt made another proposal to the Club in 1980 to exchange his interest in the lots he owned for some of the unsold lots in another area of the Club's property which was located outside the minimum lot-size requirements. Schmidt was informed at a November 1980 Club meeting that the Club was not interested in exchanging lots.

After 1980, Schmidt continued to talk to Club officials about the problem but did not succeed in having the lots developed. In May 1987 Schmidt brought this rescission action against the Club seeking to recover the amount he paid for the eight lots plus interest. In its answer the Club asserted among other things that Schmidt's action was "barred by the statute of limitations and the doctrine of laches."

Following a bench trial, the trial court determined that Schmidt's "cause of action for rescission accrued by the end of 1981, since at that time [Schmidt] should have been aware of the fact that the [Club] did not intend to take any further action in order to try to develop the subdivision for residential purposes," and that, therefore, the six-year statute of limitations did not bar the action. The trial court also determined that because the Club did not provide Schmidt with marketable record title to the lot he purchased in 1963 and failed to meet its obligation to obtain an approved subdivision plat for the property, Schmidt was entitled "to a rescission of the contract by virtue of failure of consideration." With regard to the seven lots Schmidt purchased in 1979 and 1980, the court ruled that because there was "no assignment of any cause of action for rescission from the prior lot owners to [Schmidt], [Schmidt] has no actionable right to sue for rescission on their behalf." The court awarded Schmidt the $2,000 he paid for his lot in 1963 plus interest after January 1, 1982, to the date of judgment. These appeals followed.

## SCHMIDT'S APPEAL

The dispositive issue in Schmidt's appeal is whether the trial court erred in ruling that the seven quitclaim deeds Schmidt received from other lot owners in 1979 and 1980 did not assign any cause of action the grantors had to sue the Club for rescission.

We agree with the trial court's resolution of this issue.

Some sources suggest it is doubtful whether the right to sue for rescission of a contract is assignable. "Because of the equitable and personal character of the right to sue for rescission, claims for rescission are ordinarily not assignable." *Soderberg v. Gens*, 652 F.Supp. 560, 565 (N.D. Ill.1987). See also 6 Am.Jur.2d *Assignments* § 31 (1963); 6A C.J.S. *Assignments* § 35 (1975); *Hipp v. McMurry*, 263 Ala. 11, 81 So.2d 531, 534 (1955) ["The right to rescind, which the grantor has in a conveyance . . . is a personal right, not a property right, and is not transferable until the grantor has elected to rescind during his lifetime and has taken proceedings in equity to annul the conveyance."] Assuming, however, that the right to sue for rescission is assignable, that right would not pass to the grantee by a mere quitclaim conveyance of the property absent an express assignment contained in the deed. E.g., 23 Am.Jur.2d *Deeds*, §§ 70 and 71 (1983); 26 C.J.S. *Deeds* § 106(d) (1956); *Irvine v. City of Oelwein*, 170 Iowa 653, 150 N.W. 674 (1915); *Cochran Timber Co. v. Fisher*, 190 Mich. 478, 157 N.W. 282 (1916); *In re Witherill's Estate*, 178 Or. 253, 166 P.2d 129 (1946). The quitclaim deeds in this case contain no express provision for assignment.

We have said that, "[i]n this State, 'a chose in action may be transferred either by parol or by written assignment.'" *Willow City v. Vogel, Vogel, Brantner & Kelly*, 268 N.W.2d 762, 764 (N.D.1978) [quoting *Roberts v. First Nat. Bank*, 8 N.D. 474, 79 N.W. 993 Syllabus 3 (1899)]. Schmidt has not pointed to any evidence supporting either an oral or written assignment of the right to sue for rescission and the trial court specifically found that the "former lot owners who sold their property to [Schmidt] did not assign any of their rights to sue for a rescission." We conclude that the trial court correctly determined that Schmidt could not sue the Club for rescission with regard to the lots he purchased from other individuals in 1979 and 1980.

## CLUB'S APPEAL

The dispositive issue in the Club's cross appeal is whether the trial court erred in determining that Schmidt's action was not barred by the six-year statute of limitations. We agree with the Club's assertion that, under the circumstances, Schmidt's action is barred.

An action for rescission brought under § 9–09–04, N.D.C.C., is subject to the six-year statute of limitations contained in § 28–01–16(1), N.D.C.C.[1] *Wock v. Kuhn*, 221 N.W.2d 65 (N.D.1974); *Mitzel v. Schatz*, 175 N.W.2d 659 (N.D.1970). We believe that under § 28–01–16 an action for rescission based on failure of consideration accrues when the facts which constitute the failure of consideration have been, or in the exercise of reasonable diligence should have been, discovered by the party applying for relief. See *Ell v. Ell*, 295 N.W.2d 143 (N.D.1980); *Whatley v. National Bank of Commerce*, 555 S.W.2d 500 (Tex. Civ.App.1977); 54 C.J.S. *Limitations of Actions* § 208(a) (1987). This conclusion comports with the well-established principle codified in § 9–09–04(1), N.D.C.C., that a party who fails to promptly exercise the right of rescission upon discovery of the facts necessary to rescind waives that right.[2] E.g., *Lindemann v. Lindemann*, 336 N.W.2d 112 (N.D.1983). Section 9–09–04(1) provides:

---

**1.** Section 28–01–16(1), N.D.C.C., provides:

"*28–01–16. Actions having six-year limitations.* The following actions must be commenced within six years after the claim for relief has accrued:

"1. An action upon a contract, obligation, or liability, express or implied, subject to the provisions of sections 28–01–15 and 41–02–104."

**2.** The trial court in this case determined only when Schmidt's cause of action for rescission accrued for purposes of applying the six-year statute of limitations under § 28–01–16, N.D. C.C., but did not analyze whether Schmidt had satisfied the separate requirement of a prompt rescission under § 9–09–04, N.D.C.C. Our case law demonstrates that a waiver of the right to rescind under § 9–09–04 can occur even when the action is commenced well within the running of the six-year statute of limitations. *See Lindemann v. Lindemann*, 336 N.W.2d 112 (N.D.1983) [right to rescind waived when action brought approximately two and one-half years

*"9–09–04. Rules governing rescission.* Rescission, when not effected by consent or pursuant to sections 9–08–08 and 9–08–09, can be accomplished only by the use, on the part of the party rescinding, of reasonable diligence to comply with the following rules:

> "1. He shall rescind promptly upon discovering the facts which entitle him to rescind, if he is free from duress, menace, undue influence, or disability and is aware of his right to rescind;
> ..."

In *Berg v. Hogan,* 322 N.W.2d 448, 451 (N.D.1982), we interpreted the phrase, "discovering the facts which entitle him to rescind," as meaning that "notice of facts and circumstances which would put a person of ordinary prudence and intelligence on inquiry is, in the eyes of the law, equivalent to knowledge of all of the facts a reasonable diligent inquiry would disclose." In construing the phrase "aware of his right to rescind," we stated:

> "We believe a party after acquiring knowledge of the facts has a responsibility to promptly find out, if not known, what legal rights result from them.... The party, in effect, has a two-fold responsibility to find out what the facts actually are and then find out what legal rights result from those facts, if the party is not aware of the resulting legal rights. Failure to do so will be construed against the party." *Berg v. Hogan, supra,* 322 N.W.2d at 453.

Although our comments in *Berg v. Hogan* related to whether the plaintiff had waived the right to rescind under the provisions of § 9–09–04 [see Footnote 2, *supra* ], the principles stated are equally relevant in determining when a cause of action for rescission has accrued for purposes of applying the six-year statute of limitations.

■ Generally, the determination of when a plaintiff's cause of action has accrued for purposes of applying a statute of

limitations is a question of fact which will not be overturned on appeal unless clearly erroneous under Rule 52(a), N.D.R.Civ.P. E.g., *Herzog v. Yuill,* 399 N.W.2d 287 (N.D.1987); *Phoenix Assur. Co. of Canada v. Runck,* 366 N.W.2d 788 (N.D.1985). Upon a review of the record in this case, we are left with a definite and firm conviction that the trial court was mistaken in finding that Schmidt's cause of action for rescission based on failure of consideration did not accrue until the end of 1981.

Schmidt testified that when he bought his original lot in 1963, he intended to use the lot for residential purposes. Schmidt acknowledged that in 1972 he knew that a plat had not been recorded for the property and that he could not obtain a building permit to use his lot for residential purposes because of the minimum lot-size requirement. Thus, Schmidt was aware of grounds for rescission as early as 1972. Schmidt asserts, however, that any delay in instituting suit was justified because of the Club's delay in giving him a "final definite answer" that it had no intention of doing anything with regard to development of the lots.

■ The doctrine of equitable estoppel may operate to preclude the application of a statute of limitations as a defense by one whose actions mislead another, thereby inducing him to not file a claim within the statute of limitations. *Szarkowski v. Reliance Ins. Co.,* 404 N.W.2d 502 (N.D.1987). Thus, a delay may be excusable "where, provided it is not unreasonably protracted, it is induced by defendant's promises, suggestions, or assurances which, if carried into effect, would result in a solution or adjustment without litigation." 12A C.J.S. *Cancellation of Instruments* § 70(a), at p. 758–759 (1980) [Footnotes omitted]. The reason for the rule is that "one cannot justly or equitably lull his adversary into a false sense of security, and thereby cause his adversary to subject his claim to the bar of the statute of limitations, and then be permitted to plead the very delay caused

after plaintiffs became aware of right to rescind]; *Fedorenko v. Rudman,* 71 N.W.2d 332 (N.D.1955) [right to rescind waived when action brought 16 months after plaintiffs became aware of right to rescind]. Because we con-

clude that Schmidt's action is barred by the six-year statute of limitations, we need not address whether Schmidt waived the right to rescind under § 9–09–04.

by his course of conduct as a defense to the action when brought." Annot., *Promises to settle or perform as estopping reliance on statute of limitations*, 44 A.L.R.3d 482, 488 (1972). While "the mere conduct of settlement negotiations or discussions by a defendant with a plaintiff does not alone provide a basis for estopping the defendant from pleading the statute of limitations" [Annot., *Settlement negotiations as estopping reliance on statute of limitations*, 39 A.L.R.3d 127, 131 (1971) ], it is sufficient if the defendant's " 'conduct or promises are such as are naturally calculated to and do "induce plaintiff into a belief that his claim would be adjusted if he did not sue." ' " *Szarkowski v. Reliance Ins. Co., supra*, 404 N.W.2d at 507 [quoting *Douglass v. Douglass*, 199 Okl. 519, 188 P.2d 221, 224 (1947) ].

The trial court found that there were "continuing discussions concerning development of the property" between Schmidt and the Club, but that "there is no indication of bad faith on the part of the [Club]...." The "continuing discussions" concerning development of the property were instigated by Schmidt and it does not clearly appear from the record that the Club ever specifically promised or assured Schmidt that the property would be developed as originally proposed.

Even assuming that because of the Club's apparent willingness to listen and cooperate with Schmidt during the 1970's it was estopped from relying on the statute of limitations at that time, we nevertheless conclude that Schmidt's action is barred.

"[A] plaintiff may not invoke the doctrine of equitable estoppel against a defendant unless the plaintiff exercises due diligence in commencing the appropriate legal proceeding after the circumstances giving rise to estoppel have ceased to be operational, that is, after plaintiff has notice, actual or constructive, that he must resort to legal recourse and may no longer rely upon agreements, promises, representations to the contrary, or conduct or deceptive practices which may have lulled him into a sense of security."

Annot., *Plaintiff's diligence as affecting his right to have defendant estopped from pleading the statute of limitations*, 44 A.L.R.3d 760, 764 (1972) [Footnote omitted].

The record reflects that Schmidt attended an annual meeting of stockholders in January 1980 and was told that the Club did not have any money available to develop the lots for residential purposes. When questioned about the acquisition of the seven additional lots in 1979 and 1980, Schmidt testified:

"Q You entered into this and bought those lots, as we would say, as being speculative?

"A I was helping the Country Club, in my mind, or working with the Country Club to try and get these lots resolved. There was nothing done on these lots. No one ever wanted to do anything on these lots. I offered to do something with it. I contacted all of the lot owners.

"Q Prior to you going out and buying those lots in 1979 and 1980, you had the option, didn't you, of doing nothing other than going to the Country Club and saying I want my $2,000 back?

"A I had that option, that's correct.

"Q You chose not to follow that option?

"A I chose to try and promote the building of residential property on the Country Club, that's correct.

"Q Without any formal Board authority?

"A To my knowledge there wasn't any, that's right."

In order to help promote the development of the lots, Schmidt during 1980 made proposals to the Club to redesign the lot lines and to exchange lots. The trial court found that the Club informed Schmidt of its rejection of both proposals during 1980. We believe Schmidt's actions in this regard are especially significant because they underscore his actual knowledge that the Club would not follow through with its part of the original bargain, *i.e.*, providing for the residential use of Schmidt's original lot. Schmidt's proposals to redesign the lot lines and to exchange lots with the Club were no longer efforts to have the Club meet its original obligation, but were efforts to seek other remedies to rectify the problem. Schmidt's unilateral actions did

not toll the obligation to rescind promptly. Thus, we conclude that in 1980, Schmidt had, or should have had, knowledge not only of his right to rescission, but that the Club had no intention of doing anything to further the development of the lots. The trial court's finding that Schmidt's cause of action for rescission accrued at the end of 1981 is clearly erroneous.[3]

Because Schmidt filed his action in May 1987, more than six years after his action for rescission accrued, we conclude that Schmidt's rescission action was barred as a matter of law by § 28–01–16, N.D.C.C.

Accordingly, the judgment awarding Schmidt $2,000 is reversed. In all other respects, the judgment is affirmed.

ERICKSTAD, C.J., and LEVINE, MESCHKE and GIERKE, JJ., concur.

3. The trial court found that "by the end of 1981, after discussions with Richard Johnson of the [Club], [Schmidt] was or should have been aware that the [Club] had no intentions to accept his proposals for development of the property and [Schmidt's] cause of action for rescission accrued by December 31, 1981." The "discussions with Richard Johnson" apparently relate to Johnson's informing Schmidt that the proposal to exchange lots was rejected by the Club. Schmidt testified that he "believe[d] [the discussions] took place in '81." Johnson testi-
fied that Schmidt was told at a November 1980 Club meeting that the Club could not exchange lots. The trial court specifically found that Schmidt "was informed at the November 1980 meeting the [Club] was not interested in exchanging lots," and this finding is amply supported by the record. There is no evidence in the record to support the finding that Schmidt's cause of action "accrued by December 31, 1981." Rather, the evidence reveals that the cause of action accrued prior to that date.